MOTORS INSURANCE CORP. *v.* WILLIAMS.

5-1906                                    327 S. W. 2d 723

Opinion Delivered October 5, 1959.

*Knox Kinney,* for appellant.

*Harold Sharpe,* for appellee.

ED. F. McFADDIN, Associate Justice.  This is a suit brought by appellees, Williams and wife, to set aside an insurance settlement on the grounds of fraud in procurement, and to recover from appellant the amount claimed to be due on the insurance policy.  From a chancery decree granting the prayed relief as to the settlement

and awarding appellees a net amount of $122.10, appellant brings this appeal.

In July, 1957, the appellees purchased a used 1953 Buick car, and for the balance of the purchase money and insurance premium, they executed a conditional sales contract for $1,591.02, which was duly transferred to General Motors Acceptance Corporation (hereinafter called "GMAC"). The insurance policy issued by appellant, and here involved, afforded protection to appellees and GMAC for collision damage to the full value of the car, less $50.00. Appellees' car was damaged in a collision on July 21, 1958, while the said policy was in force and while there was still due GMAC a balance in excess of $500.00 on the conditional sales contract.

On July 29, 1958, the adjuster of appellant went to see Williams and wife and obtained from them the title papers of the car and a full release of all claims against appellant insurance company. On September 4, 1958, the appellees filed the present suit in the Chancery Court, alleging that the adjuster for the Insurance Company had been guilty of fraud in the said July 29th transaction, and praying for recovery of the true amount due the plaintiffs on the insurance policy. The answer denied the allegations of the complaint. At the beginning of the chancery trial, this occurred:

"THE COURT: This action, as I understand it, is brought to cancel the release on the grounds of fraud.

"MR. KINNEY: That is exactly right. The action is brought on the policy, and the company pleads payment under the policy terms, and offers the settlement agreement to them."

So the issue was pinpointed on the basis of fraud in the procurement of the release.

We have many cases discussing the materiality of the misrepresentations in order for the settlement to be held to have been fraudulently obtained. Some such cases are: *St. L. I. M. & S. Ry. Co.* v. *Hambright,* 87 Ark. 614, 113 S. W. 803; *Mo. P. RR. Co.* v. *Treece,* 188 Ark. 68, 64 S. W. 2d 561; and *Wilson* v. *Southwest Cas. Ins.*

*Co.,* 228 Ark. 59, 305 S. W. 2d 677. With the rule of these cases understood, we proceed to the evidence offered in the case at bar, which was heard *ore tenus* by the Chancery Court. The appellees were ignorant Negroes and almost illiterate: Braxton Williams, the man, was unable to read or write, except to sign his name; Octavia Williams, the woman, was barely able to read and write. The adjuster for the appellant company went to the Williams home while Octavia was away. It was raining, so the adjuster and Braxton sat in the front seat of the adjuster's car. The adjuster obtained from Braxton the "pink slip" or evidence of title to the car; prepared an instrument transferring the title of the damaged car to the appellant company; and prepared an instrument giving the insurance company a full release on the insurance policy for $500.00, all of which was to be paid to GMAC. The adjuster had the papers all prepared for signature when Octavia returned home. She was seated in the back seat of the car; and the papers were signed.

Both of the appellees insist that the adjuster told them that they would get another car for the damaged car; and that the car was a total loss. Braxton Williams testified:

"A. He told me it was—the car was a total loss.

Q. You wanted insurance on your car for a total loss?

A. Yes, sir.

Q. And he told you it was a total loss?

A. Yes, sir. . . .

Q. And you understood when you put your signature to that thing you were settling up with the insurance company, didn't you?

A. I didn't; no, sir.

Q. You didn't understand that? Then why did you sign it?

A. Well, I signed it for the insurance company, to get another car.''

Octavia Williams testified:

''Q. When you were signing this you knew you were signing it to settle up for the car, didn't you?

A. No, sir; I didn't know it. I wouldn't have signed nothing if I knew we wasn't going to get another car.

Q. Didn't you hear him say it wasn't good enough to have repaired; that he wasn't going to have it repaired, and that it was a total loss?

A. He said then it was tore up so it couldn't be repaired. I knew it was tore up, but I thought he was going to give us another car if it couldn't be fixed.''

The adjuster himself admitted that he told the Negroes the car was a total loss. At one place he testified:

''I went to the Williams' house to contact the insured. They were both named as insureds on our policy. Braxton was there. He asked me—I told him who I was, introduced myself, and I told him his car was a total loss and couldn't be economically repaired.''

And again he testified:

''I don't think I said anything about the bill of sale. I explained it, and told them the car was a total loss, and that we could only pay $500.00 for it. And I explained to them how I arrived at that figure, that being the market value.''

It developed in the testimony that the car was not a total loss. The adjuster admitted after ''settling'' with the appellees he was able to get a bid of $159.75 for the salvage value of the car; and the car was sold. So when the adjuster told the appellees that the car was a total loss he misrepresented the facts, certainly to the extent of $159.75; and this was a material fact within the knowledge of the appellant company and certainly not within the knowledge of the ignorant Negroes.

Furthermore, the adjuster admitted that he told the appellees that the total value of the car before the collision was $550.00; and that it would cost more than that amount to repair the car. Yet the adjuster later admitted in his testimony that he knew all along that the car could have been completely repaired for $443.44, of which amount the insurance company would only have paid $393.44 because of the $50.00 deductible provision. It is clear that this misrepresentation was made because of the close relationship between the appellant insurance company and GMAC, which had already notified this adjuster that it wanted its money rather than a continuing conditional sales contract on a repaired car.

Finally, the adjuster represented to the appellees that the value of the car before the collision was $550.00. He made the $50.00 deductible and had the Negroes sign a full release and bill of sale of the car for $500.00, all of which was to go to GMAC and still leave a balance due by the appellees. The learned Chancellor knew human characteristics and psychology well enough to know that these appellees would never have "signed away everything" on any such understanding. The Chancellor necessarily found that the matters had been misrepresented to the appellees, and so the Chancery Court gave the judgment for an amount sufficient to equal what they should have rightfully received under the insurance policy.

Affirmed.